**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
DEL MONTE FRESH PRODUCE N.A., INC.,    :

                                     :

                    **Plaintiff,**    :

                                     :       **1:12-cv-3567 (ALC)**

     -against-                         :

                                     :       <u>**OPINION & ORDER**</u>

M/V LOMBOK STRAIT her engines, boilers,    :
tackle, furniture, apparel, etc., in rem;    :
SEATRADE GROUP N.V., LOMBOK    :
STRAITSCHIFFSGESELLSCHAFTMBH& CO.    :
KG, in personam,    :

                                     :

                   **Defendants,**    :
-------------------------------------------------------------x

*3/16/2015*

**ANDREW L. CARTER, JR., United States District Judge:**

## I.   INTRODUCTION

    This action arises out of a shipment of bananas consigned to Del Monte Fresh Produce
N.A., Inc. ("Del Monte" or "Plaintiff") and shipped aboard the M/V Lombok Strait ("the
Vessel") in January 2012 from Santo Tomas de Castilla, Guatemala ("Santo Tomas") to
Gloucester, New Jersey.  Del Monte alleges that the Guatemalan bananas started to prematurely
ripen while aboard the Vessel, which is owned by Defendant Seatrade Group N.V. ("Seatrade"),
such that most of the cargo could not be sold.  Defendants insist that the bananas ripened because
they were defective when they were loaded on the Vessel and that this absolves them from
liability.  This Court held a nonjury trial on April 28 and 29, 2014.  This Opinion & Order shall
constitute this Court's written findings of fact and conclusions of law pursuant to Rule 52(c) of
the Federal Rules of Civil Procedure.

## II. BACKGROUND

### A. Factual Background

#### 1. The Vessel

The M/V Lombok Strait is a refrigerated ocean-going cargo vessel that was built in 2002. Since 2005, the Vessel has been directed by Network Shipping Limited ("Network"), Del Monte's transportation arm, to perform biweekly round-trip liner service from Central America to the United States. The vessel loads cargos of fruit, including bananas, in Moin, Costa Rica and then sails to Santo Tomas de Castilla, Guatemala, where further cargos of bananas and other fruits are loaded, and then sails directly to Gloucester City, New Jersey which takes about three and half days. The subject voyage was during one such Moin-Santo Tomas-Gloucester City service. The voyages are numbered consecutively for each year of service, and the subject voyage ("Voyage 4") was the fourth in 2012.

The Vessel is divided into four separate storage areas, called "holds" which are labeled from the front of the ship (the bow) to the back the of the ship (the stern). Each hold has 4 layers of decks, which are labeled "A" nearest the top of the ship, to "D" which is at the bottom of the ship, except for hold number 1, which only has three decks in it, labeled 1FC, 1A and 1B. Each hold is watertight, with insulated walls and is not exposed to the outside. Decks A and B and Decks C and D share a ventilation system, respectively. Insulation is provided between the B and C decks in the holds. Supply and return air temperatures for the cargo holds are monitored through an automatic reefer plant data logger, and recorded through a separated connected printer.

Each hold is supplied with both cool, refrigerated air and fresh air. The air from both systems is circulated through large trunks or ducts. The cooled air emanates from large fans to

2

each of the holds where it is directed underneath the floor, upwards, through the pallet loads of cargo sitting on top of the steel decking, and is collected at the ceiling where it is sucked back to the engine room for further cooling. The fresh air ventilation system, on the other hand, allows fresh air in from outside the ship as desired in an effort to remove gases that have accumulated in the holds. The fresh air enters the holds through a common supply and a single fan at the top of the masthouse that blows air down into a distribution manifold inside the masthouse. From the manifold, air is distributed to the individual decks through separate ducting trunks. The fresh air ducting goes through an electronically controlled and motorized metal damper which can be adjusted from the engine room as necessary to control the supply of fresh air. In an open position, air is allowed through; in a closed position, the air is blocked from going through the ductwork. There is one damper for each trunk, as well for the ducts, and the dampers remove the air from the hold and discharges it on the masthead.

It is undisputed that, at the time of Voyage 4, the fresh air supply inlet ducts and dampers in each masthouse and cargo holds were in poor condition due to corrosion, and that Defendants were aware of this. There were holes in the inlet side of the trunking, between the supply fans and open end of the supply trunking which is located inside the individual cargo decks. The result of the corrosion was that the fresh air vents could not be shut off, and were continuously allowing fresh air from outside the ship to enter and circulate in the ships holds, even if the fans in the fresh air intake were not turned on. Consequently, fresh air was always drawn in into the ventilation system during Voyage 4.

The timing and quantity of a hold's fresh air ventilation during a voyage is determined in part by the hold's level of carbon dioxide ("CO2"), which correlates with the level of ethylene. During Voyage 4, the fresh air fans were set to start automatically if the CO2 level reached 0.8

3

percent.  The Vessel is equipped with a CO2 and oxygen ("O2") analyzer ("CO2 analyzer")

which draws air from each of the compartments through a sampling tube.  The analyzer has

separate sensors for O2 and CO2.  While the parties agree that the O2 sensor requires yearly

replacement of its sensor strip, they disagree as to whether the CO2 sensor ever needs

replacement.  During Voyage 4, the Vessel did not have a handheld CO2 measuring device

aboard, although one is now kept aboard during voyages.

   On January 22, 2012, the same day loading commenced in Moin, Costa Rica for Voyage

4, the Chief Engineer, Dmitry Shishov, performed maintenance work on the CO2 analyzer.

(Shishov Dep. Tr. 164: 3-13).[1]  Shishov testified that he attempted to replace the O2 sensor

because the computer program Vessel Information System indicated it needed to be replaced.

(Shishov Dep. Tr. 164:24 – 165:8.)  Shishov did not have training on how to maintain the

instrument, but read the instruction manual.  (Shishov Dep. Tr. 164: 14-23).  Shishov initially

testified that he changed the CO2 sensor on the machine, but eventually conceded that he had in

fact changed the O2 sensor.  (Shishov Dep. Tr. 164: 3-13.)  Shishov, however, could not recall

whether he had later done additional work on the CO2 analyzer, or whether anyone told him to

calibrate or otherwise alter the CO2 analyzer during the voyage following Voyage 4 in early

February 2012.  (Shishov Dep. Tr. 193:17 – 194:3.)

     *2.  The Charter Party*

   Since June 22, 2007, the Vessel has been the subject of a charter party contract (the

"Charter Party") between Network and Seatrade.  As of the date of Voyage 4, the Charter Party

had been renewed and was in place for both the Vessel and her sister vessel, the M/V Luzon

---

[1]   Deposition testimony is cited herein as "[Surname] Dep. Tr."  Trial testimony is cited as "Trial Tr."

Strait.  The Charter Party provides that the Master of the Vessel is "under the order of [Network] as regards employment, agency, or other arrangements," and that Network is to "arrange and pay for loading, trimming, stowing . . . , unloading, weighing, tallying and delivery of cargoes." Network is also "authorized to sign Bills of Lading on behalf of Master in accordance with loading tally and/or Mate's receipts."  Finally, the Charter Party provides that "any dispute arising under this contract to be referred [sic] to arbitration in New York and [United States] law to apply."

### 3.  *Del Monte's Guatemalan Bananas*

Bananas are normally cut while green and remain alive after harvest with their vital process continuing at a rate and for a period largely dependent on the temperature of the fruit. The higher the temperature of the fruit, the greater the rate of respiration and the sooner the post-harvest life of the produce will be brought to an end by deterioration and decay.  Banana respiration is characterized by a sudden and rapid increase at the start of the ripening process, known as the "climacteric."  The climacteric rise is triggered by ethylene, which is produced in small but significant quantities by the fruit itself, and correlates with $CO_2$ levels.  Normal ripening in bananas involves a change in peel color, from green to yellow, a change in pulp firmness, from hard to soft, and a change in composition, from starch to sugar, with these changes being realized within a few days of the start of ripening.  The level of banana ripening is generally expressed in stages, with Stage 1 being hard, green pre-climacteric fruit and Stage 7 being completely yellow and ripened, post-climacteric bananas with sugar spots.

Del Monte has been growing bananas in Guatemala since 1972, harvesting them five days a week.  It shipped approximately 31 million boxes of bananas from Guatemala to the United States in 2012.  Del Monte owns eight farms in the northern region of Guatemala and

purchases fruit from other farms in the southern region.  Bananas are harvested between one to eight days before departure of the transporting vessel for the United States.

A bunch or stem of bananas generally has eight to twelve hands, with a hand born about daily until the last, false hand (i.e., a hand with an incomplete set of fingers) starts growing. When the false hand grows, the bunch is bagged for protection from insects, the sun, etc.  This generally occurs when the bunch is between two and three weeks old.  All bunches that reach the age to be bagged during the same week are identified with a color-coded ribbon, with the color being changed weekly for differentiation purposes.  Each week, the cutters begin to evaluate all the stems bagged with the ribbon color that indicates that the fruit is 12 weeks old.  The cutters determine whether these bananas are ready for harvest based on the caliper width of some of the bananas on the biggest stem.  The bananas are usually harvested at an age between 12 to 14 weeks, when the caliper width is between 8 and 17.  If the caliper width is not the recommended size by the time the fruit is 14 weeks old, the bunch is nevertheless harvested and each hand is inspected, with those satisfying Del Monte's specifications sent for packing and the deficient bananas rejected and sold in local markets.

After the bunches are harvested, the bananas are transferred to a rail which transports them to a packing shed in the middle of the farm, which takes about 45 minutes to an hour.  The packing shed is staffed by several Del Monte personnel tasked with monitoring the inspection, cleaning, packing and transport of the bananas.  At the packing shed, they are inspected again for consistency with Del Monte's length and caliper width specifications, with any unsatisfactory fruit being rejected.  Then, after being separated, washed, weighed, disinfected, boxed and palletized at the packing shed, the bananas are loaded into a truck for transport to a warehouse.

Before bananas are loaded upon the vessel, some boxes are randomly selected for Del

Monte's "green life program." The objective of the program is to determine how long after harvest the bananas will start to ripen. The program is implemented weekly through the selection of random boxes of bananas and exposing them to conditions similar to those on a voyage from the tropics to North America. Del Monte's minimum standard for any set of green-life bananas is 14 days; the green-life bananas harvested with those aboard the Vessel on Voyage 4 lasted between 25 to 28 days.

Generally speaking, Del Monte, like most banana producers, has "cut-to-cool" guidelines which require that bananas be placed in refrigerated storage between 24 and 36 hours after being cut. This is largely a nonissue for bananas from the northern farms in Guatemala, since the estimated transit time from those farms to the cold store warehouses is between two to four hours. As a result, the trucks transporting these bananas generally do not have refrigerated containers. On the other hand, because the transit time from southern farms is between 20 and 24 hours, the trucks that transport the bananas from those farms are equipped with refrigerated containers for the fruit, which maintain a delivery air temperature of 13.3 degrees Celsius. Del Monte ensures the containers cooled the fruit during transport by verifying the amount of diesel utilized by the trucks after the trip, as well as by checking the temperature of the fruit upon discharge at the warehouse.

Upon arrival, Del Monte either unloads the bananas into the cold store warehouse in Santo Tomas or keeps the fruit in the container and sends it to the port area where it can be stowed in a reefer banking, which provides electricity to maintain the refrigeration unit until the vessel arrives. If the fruit is harvested and arrives from the northern farms on the same day that a vessel is departing from Santo Tomas, and the vessel is already operating, the fruit is sent directly to the vessel for loading. If a container is sent to the port and plugged into the electric

bank, Del Monte personnel monitor and log the temperature every four hours.

If a container is stored in the warehouse, Del Monte assigns the fruit to a cool room and its employees discharge the pallets after obtaining the transport temperature data and taking pulp temperatures of the fruit. Every six hours, Del Monte quality inspectors measure ethylene in the cool rooms, which is to be maintained at a level less than 0.1 percent. The inspectors also check ambient air and pulp temperatures of the bananas. Random inspections of the bananas are also conducted while in the cool rooms—10 boxes from one container from each southern farm and five boxes from one pallet from each northern farm are checked. The bananas in these boxes undergo a table inspection for curvature, length, general quality and observable defects.

Del Monte starts loading bananas into containers at the warehouse for transport to the port once the vessel has arrived at the berth. The containers that bring fruit from the warehouse to the vessel are refrigerated by a reefer engine which is used on the first trip (in case of any delays) but not on any subsequent trips. Upon arrival, Del Monte personnel and the first officer of the vessel check the pulp temperatures, in the front, middle and at the end of truck, and conduct a walk-over inspection of the pallets before loading.

### 4. *Carriage Instructions*

Like most other banana shippers, Del Monte provides instructions to the Chief Engineer for proper cooling and other care of the cargo during the ocean voyage so as to avoid ripening. Specifically, through Network, Del Monte provided the "Carriage and Stowage Recommendations – Version 12 November 2011" ("Carriage Instructions") to Seatrade and the vessel's crew prior to the commencement of Voyage 4. The Carriage Instructions contain recommendations for the cooling and ventilation of the Vessel holds before and during loading and during transportation of the fruit to the destination port. Two aspects of the Carriage

8

Instructions are particularly relevant to this case.

First, for precooled cargo, defined as fruit with a pulp temperature of 19 degrees Celsius or lower at the time of loading, the Carriage Instructions provide that the Vessel apply "shock treatment" to the fruit. This entails the application of a delivery air temperature of 12.2 degrees Celsius to the fruit until the return air reaches 13.9 degrees Celsius, at which point the delivery air is raised to 13 degrees Celsius until the pulp temperature reaches 13.3 degrees Celsius at any place in the compartment. Once the pulp temperature reaches 13.3 degrees Celsius, the delivery air temperature will be reset to 13.3 degrees Celsius. Non-precooled fruit (i.e., fruit above 19 degrees), meanwhile, is cooled with a delivery air temperature of 13 degrees Celsius until the return air reaches 13.9 degrees Celsius and the pulp temperature at a place in the compartment reaches 13.3 degrees Celsius, at which point the delivery air temperature is raised to 13.3 Celsius. Any refrigeration compartment that contains a mix of pallets with precooled and non-precooled bananas is cooled normally and not subjected to shock treatment.

Second, the Carriage Instructions require that the vents to the decks be closed for the first 48 hours and then vented as necessary to assure that $CO_2$ levels do not go over 1.0 percent. During the first 48 hours of the voyage, there is some fruit that is onboard that still contains field heat, and the objective of closed air vents is to facilitate the rapid pull down of fruit pulp temperatures by preventing any additional heat from entering the hatches. After this 48-hour period is over, the Carriage Instructions require that the ship not ventilate unless the $CO_2$ level exceeds 1.0 percent.

### 5. Voyage 4

On January 23, 2012, a cargo of Del Monte pineapples and bananas was loaded in Moin. The pineapples were stowed in decks 2C (336 pallets) and 2D (208 pallets), and the bananas

were stowed in decks 3C (216 pallets/10,368 boxes), 3D (377 pallets/18,096 boxes) and 4D (192 pallets/9,216 boxes). Loading was completed at 7:00 p.m. and the Vessel departed for Santo Tomas at 9:00 p.m. The Vessel's anticipated arrival in Santo Tomas was delayed by approximately 11 hours, however, for repairs to engine parts that had been installed at Moin.

Loading of cargos of cantaloupes and bananas in Santo Tomas commenced at 1:05 a.m. on January 26, 2012. The bananas which were loaded had been harvested between January 19th and January 26th. Before loading commenced, Del Monte's quality control inspector inspected the Vessel for the presence of ethylene and measured the temperatures in the holds, among other things, without identifying any problems. During loading, the Vessel's crew took pulp temperatures of the bananas and memorialized it in a log. The pulp temperatures of the bananas loaded ranged from 16 to 31 degrees Celsius (the maximum allowed on by Del Monte is 32.3 degrees Celsius), and the crew did not take exception to the temperature of any of the fruit. However, because the bananas were packed into cardboard boxes which only have small finger holes, the Vessel's crew was unable to the otherwise evaluate the condition of the cargo.

Cantaloupes were stowed in decks 2A (464 pallets/25,984 boxes) and 2B (407 pallets/22,729 boxes). The Guatemalan bananas were stowed in decks 1FC, 1AB, 3ABC, and 4ABC as follows: 120 pallets/5,694 boxes in deck 1FC, 418 pallets/19,959 boxes in deck 1A, 241 pallets/11,511 boxes in deck 1B, 510 pallets/24,859 boxes in deck 3A, 510 pallets/24,480 boxes in deck 3B, 288 pallets/13,857 boxes in deck 3C, 432 pallets/21,033 boxes in deck 4A, 432 pallets/21,284 boxes in deck 4B, and 372 pallets/19,056 boxes in deck 4C, and 3080 pallets/ 156,257 boxes of Guatemalan bananas were stowed in containers. All of the Guatemalan bananas that were harvested on January 19th were loaded into refrigerated containers, while all of the fruit harvested on January 26th went into decks 1FC, 3A and 4A. Fruit that was loaded in

the containers on the deck of the vessel as well as Hold 1 came from the same farms as fruit from Decks 3ABC and 4ABC. Per the Carriage Instructions, the fruit loaded in Decks 1A, 3A and 4A were to be subjected to shock treatment because of their temperatures.

After the cargos were loaded aboard the Vessel in both Costa Rica and Guatemala, Network issued bills of lading to Del Monte for the cargo, attesting to the fact that cargo was in apparent good order. The bills of lading are on Network letterhead, and describe the various Guatemalan and Costa Rican farmers as the "shippers" of the cargo, and Del Monte as their consignee. Network signed the bottom of the bills of lading, "for the master," i.e., the captain of the ship employed by Seatrade, pursuant to the Charter Party.

The sea voyage from Santo Tomas to Gloucester City commenced at 8:00 p.m. on January 26, 2012. The voyage was not eventful and weather conditions were favorable. The Vessel's crew did not see or smell any ripe or turning bananas during Voyage 4. The crew also took pulp temperatures of the fruit daily during the voyage, and these were not alarming. However, although the printer and the refrigeration system are ordinarily started two days before loading in Moin, the Chief Engineer neglected to switch on the printer for automatically logging the $CO_2$ levels until 7:26 p.m. on January 26th, and there are therefore no records $CO_2$ levels for Voyage 4 before this point. (Shishov Dep. Tr. 110:3 – 111:7.) The data logger printed records every four hours thereafter until the Vessel's arrival Gloucester. With the exception of Hold 3B, all the $CO_2$ readings during Voyage 4 ranged between 0.3 percent and 0.6 percent without the fresh air ventilation system ever operating. At 8:00 p.m. on January 27th, the $CO_2$ level in Hold 3B reached 0.8 percent, but dropped to 0.3 percent at noon on the same day. The parties agree that shock treatment was not properly administered to Hold 1FC during the Voyage; additionally, one of Defendants' experts, Kevin Wilkie, conceded that the data logger temperature records

11

suggest that shock treatment was also not properly applied to holds 3A and 4A.  (*See* Joint Trial Ex. 10; Trial Tr. 221:4 – 224:2).

### 6.  *Discharge & Investigation*

After a three-and-a-half day voyage, the Vessel arrived at the port in Gloucester on Monday, January 30, 2012, at 11:00 a.m. and commenced discharging the cargo to Holt Terminal, which Del Monte hired to discharge the fruit and store it before distribution.  During the first day of discharge, both the crew and Del Monte personnel did not smell or see any ripe and turning bananas, and the pulp temperatures were within a level acceptable to Del Monte. The bananas were stored in Holt Terminal's warehouse, about 20 feet from where the Vessel was docked.  They did not activate the ethylene monitor in the warehouse, and random inspections by Del Monte personnel also did not detect any ripe and turning bananas.

On the second day of discharge, however, Del Monte personnel discovered ripe and turning bananas in the Holt warehouse from the bananas that had been discharged from the Vessel the day before.   James Dott, Plaintiff's surveyor, was called into investigate the loss and conducted a joint inspection with Jerome Pereira, cargo surveyor for CSL Global who was appointed by Seatrade on February 1, 2012.  The surveyors found ripe and turning Guatemalan bananas present in Holds 3ABC and 4ABC, with approximately 20 percent of the pallets carried in these holds containing one or more carton with yellow ripe bananas at stage 3 or higher. They dismantled approximately 40 or 50 pallets and looked at hundreds of boxes, and observed, among other things, that yellow ripe bananas were commingled with green bananas in the same boxes and pallets, that the bananas at the bottom of the pallets were significantly greener than bananas at the top of the pallets, and that some pulp temperatures of randomly tested fruit were abnormally high.  The Costa Rican bananas, including those loaded in hold 3C, meanwhile,

12

outturned in good condition, as did the pineapples and melons.  Del Monte dumped a total of 35,827 cartons of bananas, donated 8,186 cartons, discounted 24,535 cartons and 7,503 cartons of bananas were sold at depreciated values.  The parties have stipulated that Del Monte incurred losses of $925,000 in connection with these bananas.[2]

An investigation by Del Monte into the Guatemalan farms after Voyage 4 did not produce any evidence of diseases or defects in the fruit or deficiencies in its processes, and Del Monte did not have any other ripe and turning issues with Guatemalan bananas during early 2012.  In fact, another vessel that arrived in the Galveston, Texas the same week as Voyage 4, which carried bananas cut from the same Guatemalan farms as those on the Vessel for Voyage 4, did not have any ripe and turning claims at discharge.

### B.  Procedural Background

Plaintiff commenced this action on May 4, 2012.  In its May 7, 2012 Amended Complaint, it alleged that Seatrade, the Vessel itself, the Vessel's registered owners, Lombok Strait Schiffahrtsgesellschaft mbH & Co. KG (hereinafter "LSS") and Mpc Munchmeyer Petersen Stemaship GmbH & Co. KG (hereinafter "MPC"), and the Vessel's operations manager, Beteilingungsges – Reefer Flottenfonds mbH & Co. KG (hereinafter "BRF"). were jointly and severally liable for all of Plaintiff's losses, together with attorney fees, pre and post judgment interest and costs.  (ECF No. 3.)  MPC and BRF were subsequently dismissed by way of joint stipulation.  (ECF No. 76.)  On September 13, 2012, Defendants filed a third-party complaint against Network, alleging that Plaintiff's damages, if any, were caused by Network's "default, negligence, carelessness, omissions, fault, tortious interference, breach of warranty,

---

[2]     The parties dispute whether the bananas loaded in Guatemala into hold 1FC, which were destroyed accidentally according to Plaintiff, outturned damaged in New Jersey, but this issue is immaterial to the Court's resolution of this case.

breach of duty as bailee and or breach of Charter Party contract dated June 22, 2007," such that Network was directly liable to Plaintiff and/or should be liable to Defendants by way of indemnification and/or contribution. (Third-Party Compl. ¶ 9, ECF No. 11.)  Network never appeared in this action, however, and Plaintiff and Defendants subsequently entered into a Stipulation and Order of Dismissal without Prejudice and Tolling Agreement on January 15, 2013, under which Network was dismissed from this action provided that, *inter alia*, any judgment for Del Monte against Seatrade in this action would be proportionately reduced "should [Network] be found solely liable for any part of the damages alleged by Del Monte in the underlying claim." (Stip. ¶ 4, ECF No. 14.)

A nonjury trial was held on April 28 and 29, 2014, and post-trial briefs and replies were submitted on June 16 and June 30, 2014, respectively.  Prior to trial, the parties submitted direct testimony by way of deposition excerpts for fact witnesses and expert reports for expert witnesses.  Plaintiff submitted deposition excerpts for the following witnesses: Dott, Pereira, Dale Rolfe, a corporate representative for the Defendants who handles technical claims for Seatrade, Ernest Casper, Port Manager for Del Monte in Gloucester City, Stephen Johnson, a Del Monte employee who was involved in the damage mitigation efforts, Alejandro Olmos, Del Monte's Quality Manager in Gloucester, New Jersey, Luis Fajardo, Del Monte Superintendent of Operation in Puerto Barrios, Guatemala, Luis Enrique Rivas, Del Monte Quality Control Superintendent in Guatemala, Hector Soberon, an employee of Bandegua Quality Control, a division of Del Monte, John Shields, the technical marine surveyor appointed by Del Monte to inspect the vessel, Stijin Vodde, the superintendent of the Vessel at the time of Voyage 4, Walter Tordoff, Director of Quality Assurance and Technical Services at Del Monte, Glen Suarez, Director of Marine Claims and Insurance at Del Monte, Christopher Elmer, Vice President of

Bananas and Pineapples Sales Coordination at Del Monte, Tienco DeVries, current superintendent of the Vessel, Shishov, and Michael Visser of Wilhelmsen Technical Solutions, which provides maintenance to Seatrade's CO2 and O2 sensors.  Plaintiff also submitted expert reports for Rolando Santos, a marine engineer and technical expert on the causes of loss, and John Valpreda, a fruit expert with over 35 years of experience in quality control of bananas. Defendants cross-examined Santos and Valpreda at trial.

Defendants submitted deposition excerpts as testimony for Messrs. Johnson, Soberon, Rivas, Suarez, Tordoff, Casper, Dott, DeVries, Shishov, Elmer, Fajardo, Olmos, Pereira, Shields and Visser.  Defendants also submitted the entire depositions of Rolfe and Vodde, as well as the expert reports of Kevin Wilkie, a reefer consultant, Jeroen de Haas, BMT Surveys, and Dr. Anna L. Snowdon, University of Cambridge.  Plaintiffs cross-examined Wilkie, de Haas and Dr. Snowdon at trial.

## III. DISCUSSION

### A.   Legal Standards

The Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 *et seq.*, sets forth the responsibilities, liabilities and rights of carriers involved in the carriage of goods into the United States from ports outside of the United States.  A "carrier" is defined in the statute as the "owner, manager, charterer, agent, or master of a vessel."  46 U.S.C. § 30701.[3]  The statute imposes a duty upon carriers to properly load, handle, stow, care for, and discharge the goods carried, and prohibits them from contracting out of liability for breach of this duty.  *See* 46 U.S.C. § 30704. The statute also imposes a non-delegable, unwaiveable duty upon the carrier to "exercise due

---

[3]      While a vessel is not considered a "carrier" under COGSA, pursuant to the doctrine of ratification, it is bound *in rem* by all the terms of the operative contract of carriage once goods are loaded aboard it.  *See Man Ferostaal v M/V Akili*, 704 F.3d 77, 83-84 (2d Cir. 2012).

15

diligence to . . . make the vessel seaworthy," 46 U.S.C. § 30705(a)(1), (b), with seaworthiness

being defined as "'the ability of a vessel adequately to perform the particular services required of

her on the voyage she undertakes.'" *GTS Indus. S.A. v. S/S "Havtjeld"*, 68 F.3d 1531, 1535 (2d

Cir. 1995) (quoting *McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am.*, 244 F.2d 867, 870 (2d

Cir. 1957)).

       Liability under the statute is adjudicated pursuant to a burden-shifting framework.

Initially, a plaintiff-shipper must establish a *prima facie* claim by showing that the cargo was

"'damaged while in the carrier's custody.'" *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351

(2d Cir. 1981) (quoting *Pan-Am. Hide Co. v. Nippon Yusen*, 13 F.2d 871, 871 (S.D.N.Y. 1921)).

Once the plaintiff has presented a *prima facie* case, there is a presumption of liability and the

burden of proof shifts to the defendant to establish that the damage was not caused by its

negligence or that the damage falls under one of COGSA's exempted causes. *See Madow Co. v.

S.S. Liberty Exporter*, 569 F.2d 1183, 1185 (2d Cir. 1978); *see also* 46 U.S.C. § 30706(a), (b).  If

the carrier discharges this burden, the presumption vanishes, and the burden returns to the

shipper to show that carrier negligence was at least a concurrent cause of the loss or damage to

the cargo. *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 105 (2d Cir. 1977).  If the

plaintiff makes such a showing, the final burden rests with the carrier to establish the appropriate

apportionment of fault, or bear the entire loss.  *Id.*

    **B.**    **Application**

       The core disputes between the parties in this case concern two threshold issues. *First*, the

parties dispute whether Plaintiff has a cognizable claim against the Defendants under COGSA, or

whether only Network can sue Defendants under the terms of the Charter Party. *Second*, the

parties dispute whether Plaintiff has established its *prima facie* case for liability under COGSA

by showing that the goods were delivered in actual good order and condition. The Court will consider each of these issues in turn.

1. *Del Monte has a cognizable claim under COGSA against Defendants under the bills of lading.*

Defendants argue that Del Monte does not have a viable claim against it under COGSA because the bills of lading served merely as receipts and not contracts of carriage, and that Plaintiff's claims under the bills of lading are against Network, who can in turn sue Seatrade under the Charter Party. COGSA provides that it only applies to

> contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

46 U.S.C. § 30701 note § 1(b). As the Second Circuit observed in *Man Ferostaal v. M/V Akili*, 704 F.3d 77 (2d Cir. 2012), historically, courts have interpreted this provision as roughly distinguishing between "public" or "common" carriages involving multiple cargos and shippers, which are governed by COGSA, and "private" carriages involving a single cargo and shipper, which are exempted from COGSA. *Id.* at 86. Under this analysis, charter parties and bills of lading are treated as proxies for private and public carriages, respectively. *See id.* These distinctions, however, are not *per se* dispositive of COGSA's applicability. *Id.* (citing *Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 327-28 (2d Cir. 1972)). Indeed, the Fifth Circuit has endorsed what is referred to as the "governing instrument" standard, under which the issue of COGSA applicability is determined based on which document, the charter party or the bill of lading, governs the relations between the litigants. *See id.* (citing *Tradearbed Inc. v. W. Bulk*

*Carriers K/S*, 374 F. App'x 464 , 474 (5th Cir. 2010)). In *Akili*, the Second Circuit recognized

that there can be some tension between the two standards, but did not ultimately decide whether

or when the public/private carriage test or the government instrument test controls on the issue of

COGSA's applicability. *See id.* at 87.

In this case, after reviewing the relevant case law and the parties' submissions, the Court

finds that COGSA does in fact apply, for two principal reasons. *First*, Voyage 4 very clearly

was a common carriage. This is true because, although Network chartered the full reach of the

Vessel from Defendants, the fruit that was shipped was owned by the various farms it was

sourced from in Guatemala and Costa Rica. *See, e.g., Man Ferrostaal, Inc. v. M/V Akili*, 763 F.

Supp. 2d 599, 610 (S.D.N.Y. 2011) (noting that "[n]o court in this Circuit has found that a

shipment made pursuant to voyage or time charter for only a portion of vessel was a private

carriage, *even if the party with whom the shipper had contracted has itself the chartered the

entirety of the vessel*") (emphasis added), *aff'd*, 704 F.3d 77 (2d Cir. 2012).

*Second*, COGSA also applies under the governing instrument standard and Defendants'

argument that it does not because Network is Del Monte's transportation arm, and in their view

effectively issued the bills of lading to itself, is unpersuasive. While it is true that, as Defendants

point out, "bill[s] of lading issued under a charter party [are] only . . . receipt[s] when [they]

remains in the hands of the shipper charterer," *see, e.g., Nichimen Co. v. M/V Farland*, 462 F.2d

319, 329 n.7 (2d Cir. 1972), this principle is commonly applied in cases where the bills of lading

were issued *by* an agent of the shipowner-carrier *to* the shipper-charterer, as opposed to the

circumstances in this case, where the charterer (Network) issued bills of lading on behalf of the

master to the shipper (Del Monte). *See, e.g., Vanol USA, Inc. v. M/T Coronado*, 663 F. Supp.

79, 81 (S.D.N.Y. 1981) (finding that bill of lading issued by master as agent for shipowner-

18

carrier to charterer-shipper were receipts and the rights and liabilities of the parties were

governed by the terms of the charter party); *Ministry of Commerce, State Purchases Directorate*

*of Athens, Greece  v. Marine Tankers Corp.*, 194 F. Supp. 161, 163 (S.D.N.Y. 1960) (holding

that bill of lading issued by shipowner was not a contract of carriage because "in cases where the

bill of lading remains in possession of the charterer himself, i.e., *in a controversy between*

*charterer and shipowner*, the bill of lading has been regarded as a mere receipt which does not

supersede the charter provisions") (emphasis added).  The putative purpose of the rule, moreover,

is *to prevent shipowners-carriers* from unilaterally altering their relations with charterer-shippers

through the issuance of bills of lading which are inconsistent with charter parties.  *See Asoma*

*Corp. v. SK Shipping Co.*, 467 F.3d 817, 823-24 (2d Cir. 2006); *see also Akili*, 704 F.3d at 86-87.

That is not a consideration here, however, because Network issued the bills of lading to Del

Monte, who Defendants concede are not a party to the Charter Party.  *See Madow Co. v. S.S.*

*Liberty Exporter*, 569 F.2d 1183, 1186-87 (2d Cri. 1978) ("In those private charter arrangements

which are deemed to be outside the reach of COGSA, it is normally the shipper itself which is

also the voyage or time charterer.  The private arrangements it effects are negotiated.  The

bargaining power and skill available is deemed to be equal as between vessel and charterer.  Nor

is any shipper of only a portion of the cargo, as here, generally involved.").[4]

---

[4]      Notably, another well-settled doctrine of admiralty law militates against Defendants' interpretation.
Specifically, when charterers have been authorized under a charter party to issue bills of lading "for and on behalf of
the master," the bills of lading are deemed to delineate the rights and responsibilities of the shipowners to the
shipper.  *Asoma*, 467 F.3d at 827; *Uniwire Trading LLC v. M/V Wladyslaw Orkan*, 622 F. Supp. 2d 15, 20-21
(S.D.N.Y. 2008) ("It is hornbook law that [a] contract of carriage with an owner may be entered into either directly
between the parties, or by virtue of a charterer's authority to bind the owner by signing bills 'for the master.' ")
(citations and internal quotation marks omitted).  This was precisely what happened in this case.  Furthermore,
neither the Charter Party nor any case this Court has reviewed indicates that a charterer's authority to endorse bills
of lading "for the master" does not extend to bills of lading issued to an entity with which it has some corporate
affiliation.

   2.  *Del Monte has demonstrated a prima facie case under COGSA.*

      As noted, in order to establish a *prima facie* case of a COGSA breach, a plaintiff-shipper

must establish that "'the goods were damaged while in the carrier's custody.'" *Caemint Food,*

*Inc. v. Brasiliero*, 647 F.2d 347, 351 (2d Cir. 1981) (quoting *Pan-Am. Hide Co. v. Nippon Yusen,*

13 F.3d 871, 871 (S.D.N.Y. 1921)).  A plaintiff can discharge this burden by proving that the

cargo was delivered to the carrier in good condition and outturned in damaged condition, *see*

*e.g., Vana Trading Co. v. S.S. "Mette Skow"*, 556 F.2d 100, 104 (2d Cir. 1977), or that the nature

of the cargo indicates that the damage occurred while the cargo was in the carrier's custody.  *See,*

*e.g., Kanematsu-Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir. 1987).  Good

condition upon delivery is frequently established by a plaintiff's production of clean on-board

bill of ladings attesting to the good condition of the cargo on delivery.

      However, since bills of lading for packaged goods merely attest to the external

appearance of the cargo, they do not have "probative force where, as here, the shipper seeks to

recover for damage to goods shipped in packages that would have prevented the carrier from

observing the damaged condition had it existed when the goods were loaded." *Caemint Food*,

647 F.2d at 352.  Nonetheless, a plaintiff is not required to introduce firsthand testimony of

either the inspection of goods for an inherent vice, or of their packaging and handling prior to

transport in order to make a *prima facie* case.  *See e.g., Sartori, Inc. v. Kastav,* 412 F. Supp.

1181, 1183 (S.D.N.Y 1986) (plaintiff was not required to submit evidence of pre-voyage

inspection of internal composition of cheese to present *prima facie* case); *Associated Metals &*

*Minerals Corp.*, No. 93 CIV. 4330 (DLC), 1995 WL 794062, at *7 (S.D.N.Y. Dec. 20, 1995)

(finding plaintiff had presented *prima facie* case although "there was no firsthand testimony with

respect to the preparation of the packaging of the[] goods at the mill or their transportation to the

port"). Rather, a plaintiff could discharge their burden by showing that "the goods were prepared and packaged in accordance with proper procedures and were carried to the ship under conditions that should have prevented any damage to the contents en route." *Caemint*, 674 F.2d at 354 n.6.

Under this rubric, the Court finds the Guatemalan bananas on Voyage 4 were delivered in good condition. This conclusion is based largely on the deposition testimony of Messrs. Fajardo, Soberon and Rivas as to how Del Monte's Guatemalan bananas are grown, harvested, handled, and inspected by Del Monte and Defendants in Guatemala in accordance with procedures which were observed on each shipment before and after the one at issue, with good outturns. *See e.g., Castle and Cooke Foods v. S.S. Tobias Maersk*, 491 F. Supp. 1305, 1308 (S.D.N.Y. 1980) (finding plaintiff had presented a *prima facie* case of good order of canned pineapples on delivery to carrier through deposition testimony "as to the preparation of the cargo at the plantation, the checks made in Bangkok, [Thailand,] along with the bills of lading"). It is also supported by the satisfactory results of the green-life testing of a random sample of bananas harvested with those aboard the Vessel during Voyage 4, the fact that the bananas cut on the same days from the same farms discharged from a different vessel in good condition, as well as by Del Monte's history of successfully processing, handling and delivering a high volume of shipments on a regular basis. *See Ins. Co. of N. Am. v. M/V Frio Braz.*, 729 F. Supp. 826, 832-33 (M.D. Fla. 1990); *cf. Hershey Foods Corp. v. Waterman S.S. Corp.*, No. 82 Civ. 0533 (DNE), 1994 WL 281929, at *5-*6 (S.D.N.Y. June 22, 1994) (random testing and sampling of peanuts for toxin was not sufficient in light of extensive expert evidence that the testing and sampling methods employed were flawed). While Defendants have offered the expert opinion of Dr. Snowdon, who argues that the bananas ripened because of (1) inadequate post-harvest, pre-

21

Case 1:12-cv-03567-ALC-KNF   Document 77   Filed 03/16/15   Page 22 of 29

voyage refrigeration of the bananas at Del Monte's cool store warehouses in Guatemala, and (2) their level of maturity when harvested, the Court finds that Dr. Snowdon's testimony merely raises a possibility of inherent vice and does not disturb its conclusion of good order upon delivery. *See, e.g., S.M. Sartori*, 412 F. Supp. at 1184 (S.D.N.Y. 1976) (plaintiff had presented a *prima facie* case where "the presence of an inherent 'vice' was only a possibility put forth by defendant").

For example, with respect to the alleged inadequate cooling of the fruit, Dr. Snowdon's criticism of Del Monte's use of "boundary" instead of "forced air" cooling at their warehouses, on the grounds that the latter purportedly cools fruit with greater rapidity, is unsound on its face. Specifically, Dr. Snowdon overlooks the fact that this purported defect applies to *all* Del Monte's Guatemalan bananas which are stored in warehouses pre-voyage, but that these bananas nonetheless generally outturn undamaged. Moreover, while Dr. Snowdon criticizes Del Monte's use of boundary air cooling, she did not testify that it is contrary to industry standards, and Mr. Santos testified that it is rather common. (Trial Tr. 123:1-5.) In sum, at bottom, Dr. Snowdon's argument is tantamount to the opinion that all Del Monte's boundary cooled bananas suffer are defective because they are more vulnerable to damage if mishandled by the carrier. To find inherent vice, however, this Court would need to conclude "that th[e] *particular batch* [of bananas on Voyage 4] suffered [from a hidden defect] before being loaded aboard the [Vessel]." *Ins. Co. of N. Am.*, 729 F. Supp. at 834.[5]

---

[5]    A similar infirmity afflicts Defendants' argument that the mixing of pre-cooled and non-precooled bananas is an inherent vice of the fruit, as Defendants do not argue that this is the first time Del Monte has done so, and in fact the Carriage Instructions explicitly contemplate that it might be done in some circumstances. Moreover, to the extent that this, or the temperature of fruit, is a defect, it strains credulity to argue that it was a *hidden* one, given Defendants' knowledge of the practice and the fact that pulp temperatures were taken of the fruit before it was loaded onboard.

Additionally, with respect to the bananas' purported maturity at harvest, Dr. Snowdon relies heavily upon Dott's observation that many of the ripened bananas from Voyage 4 were supposedly "rounded" and "marginally plump" upon discharge.  For example, when questioned about the basis of her opinion of inherent vice at trial, Dr. Snowdon testified:

> There was evidence from Mr. Dott, who is a surveyor who frequently does surveys of Del Monte bananas.  His testimony was – he had a very delightful phrase.  He described the bananas as marginally plump, by which he meant they were quite a fat grade. And grade is one of the criteria used for judging the correct maturity and harvest [sic].  This experienced surveyor was very much of the opinion that these bananas to put it in simple words, looked a bit fat.

(Trial Tr. 329:5-10.)  After reviewing all the surveyors' reports and the testimony of Mr. Dott, however, the Court concludes that references the "marginal plumpness" and "roundedness" of the bananas upon discharge simply do not support a conclusion of inherent vice.

As a preliminary matter, while the Defendants ascribe both the terms "marginally plump" and "rounded," as well as the interchangeable use of the terms to Dott, the word "rounded" actually does not appear in Dott's report.  Although Dott erroneously admitted at his deposition that it did, (Dott Dep. Tr. 45:7-11), the term was apparently introduced in a report issued by DP Survey Group N.V., a report which Dott was clear that he did not write or review before publication, though he did agree with many of its conclusions.  (Dott Dep. Tr. 84:7-18, 85:14-22, 86:2 – 87:24.)  This distinction is significant because, when Dott was asked to elucidate his understanding of the term "rounded" with respect bananas, he suggested at times that it was a characteristic common to *all* yellow and ripened, as opposed to just those that might be defectively "mature at harvest."  (*See, e.g.*, Dott Dep. Tr. 47:13-15 ("[A]s a bananas matures[,] it becomes more round."); *id.* at 46:16-18 ("Q: And can a banana be a rounded fruit and be green?

Not that I'm aware."). Again, characteristics common to all bananas are not what is contemplated by the doctrine of inherent vice.

More generally, with respect to Dott's observation that some of the ripened fruit was "marginally plump," a review of his entire report and deposition testimony reveals that it was expressed in the context of his conclusion that the fruit was more susceptible to ripening, instead of as an opinion that the bananas had a hidden predisposition to ripen prematurely. For example, in stating his preliminary findings as to the cause of damage, Dott listed a number of factors which indicated that improper ventilation of the fruit during Voyage 4 was the culprit, and he tellingly omitted any references to the characteristics of the bananas. (Joint Trial Ex. 1, at 10.) In addition, when asked whether ventilation or proper cooling of the fruit might have averted the ripening, Dott noted: "yes, because you would avoid an increased level of ethylene onboard the vessel. . . . [If] it's aggressively ventilating, then there would be a less instance [sic] of ripening or therefore, eliminating ripening all together [sic]." (Dott Dep. Tr. 82:20 – 83:2.) In short, given that a cargo's susceptibility to damage due to carrier mishandling is not an inherent vice, Dott's observations do not undermine the Court's conclusion that the fruit was in good order upon delivery by Plaintiff. *See, e.g., Raphaely Int'l, Inc. v. Waterman S.S. Corp.*, No. 82 Civ. 6284 (RO), 1991 WL 278988, at *6 (S.D.N.Y. Dec. 17, 1991).[6]

---

[6]     The Court is also not persuaded by Dr. Snowdon's contention that the Court should draw an inference of inherent vice from the more advanced level of ripening that was allegedly found in some bananas at discharge, as such evidence simply does not prove that the bananas' climacteric was triggered before they were loaded on the Vessel. In drawing this conclusion, Dr. Snowdon relied on the ripening patterns of bananas in commercial ripening rooms, without analyzing whether the distinct conditions on vessels generally or the Vessel in particular would alter the conclusion. (Trial Ex. 224, ¶¶ 100-01.) In any event, even if general patterns of ripening on vessels could be discerned, the Court would be reluctant to draw any conclusions based on that here, where two of the main determinants of the point of triggering and the rate of ripening of bananas on a vessel—the effective cooling and proper ventilation of the fruit— are in doubt in light of the admitted disrepair of the Vessel during Voyage 4. (*See e.g.*, Trial Tr. 74:6-15,

Finally, assuming *arguendo* that Dott's testimony is sufficient evidence to raise the issue

of inherent vice, the Court finds the countervailing evidence sufficient to establish both a *prima*

*facie* case and by a preponderance of the evidence that the bananas were delivered in good order.

*See United States v. Ocean Bulk Ships*, 248 F.3d 331, 341 (5th Cir. 2001) (finding that

surveyor's brief, speculative comment in a survey report was not sufficient evidence of poor

packaging particularly in light of other evidence in the record).[7]  This evidence includes Del

Monte's extensive practices and procedures both before and immediately after the harvest of

bananas in Guatemala which are crafted to identify and weed out overgrade and/or mature

bananas.  In this regard, the Court finds the determinations of the grade of the bananas by Del

Monte employees who do so on a regular basis, with trained eyes and precise instruments, to be

more persuasive than Dott's stray comment, particularly in light of his lack of formal training in

banana horticulture and the imprecision with which he commented on the issue.  *See Roman*

*Crest Foods, Inc. v. S.S. Delta Columbia ex S.S. Santa Clara*, 574 F. Supp. 440, 442 (S.D.N.Y.

---

86:12-14, 104:6 – 105:8.)  Indeed, Mr. Wilkie, Defendants' own expert, made a similar observation, albeit with respect to the related issue of anticipated $CO_2$ levels in bananas.  (Trial Tr. 210:19-24 ("You cannot generalize on these types of figures.  Cargoes are so different from one voyage to the next.  Ships are different.  You can't give a figure that says I would expect this to be after 24 or 48 hours.  I think that would be wrong.").)

Relatedly, the Court declines Defendants' invitation to draw an adverse inference based on Plaintiff's failure to produce some of the temperature records for the fruit during transport in trucks from the southern farms to the Del Monte warehouse.  That the fruit was in fact cooled during voyage is supported, for example, by the evidence of the non-ambient temperatures of the fruit upon discharge at the warehouse.  *See Roman Crest Foods, Inc. v. S.S. Delta Columbia ex S.S. Santa Clara*, 574 F. Supp. 440, 442 n.5 (S.D.N.Y. 1983); (*see also* Trial Tr. 92:18-25.)

[7]       The Court is cognizant that there is a difference of opinion among courts in this Circuit as to whether the shipper or carrier bears the burden of proving or disproving inherent vice when a defendant has presented some evidence on the issue.  *See, e.g., U.S. Steel Int'l, Inc. v. Granheim*, 540 F. Supp. 1326, 1332 (S.D.N.Y. 1982) (collecting cases).  The Court does not reach this question in this case, however, because it finds that evidence establishes by a preponderance of evidence that the bananas were not suffering from an inherent vice when loaded on the vessel in Santo Tomas.

1983) (rejecting expert testimony as to proper refrigeration of nectarines from independent

surveyor who had over fifty years of experience but "had no formal training in horticulture or

refrigeration"); (*see also* Dott Dep. Tr. 6:10-14 (Dott noting that only 30 to 35 percent of his 16

years of experience surveying was with bananas).).  Relatedly, it is also noteworthy that Dott's

observations came after discharge of the bananas, while those of Del Monte's quality control

employees came before delivery to Defendants, and that Dott's testimony is consistent with the

conclusion that any characteristics he observed developed during Voyage 4.  Lastly, the Court is

influenced by the fact that it seems highly improbable that the allegedly defective bananas

randomly found their way only into Holds 3 and 4, and then were fortuitously placed primarily at

the top of the pallets in both holds.  Such a pattern smacks more of a vessel issue.

   3.  *Defendants have not established that the damage was not caused by their negligence or
       that it was caused by one of COGSA's excepted causes.*

         As indicated earlier, once a plaintiff has established their *prima facie* case, the burden of

proof shifts to the defendant to establish that the damage did not result from its negligence or that

the damage was caused by one of the excepted caused in Section 1304(2) of COGSA.

*Associated Metal v. Minerals Corp. v. S/S Jasmine*, 983 F.2d 410, 414-15 (2d Cir. 1993).  As a

result, "[a] plaintiff shipper is not required to prove that the carrier was at fault, or how the

damage might have occurred."  *M. Golodetz Exp. Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1109

(2d Cir. 1985).  Nonetheless, Plaintiff in this case has offered credible evidence that the damage

was caused by the Vessel's unseaworthiness, viz, the corroded condition of the inlet ducting that

allowed warm, tropical air as well as other gases to enter the holds, retard the cooling of the

bananas once onboard and trigger their climacteric phase.  The evidence also suggests that the

$CO_2$ monitor may have been unwittingly been tampered with by Shishov, preventing the monitor

26

from making accurate $CO_2$ readings and activating the fresh air fans when necessary, and the expert testimony of Mr. Santos indicates that the stowage of the containers might have contributed by blocking fresh air from entering the ventilation system of Holds 3 and 4 and allowing ethylene released from the containers to enter that system.  (*See, e.g.*, Trial Tr. 145:10 – 148:6.)

Defendants have not attempted to rebut much of this evidence, other than to strenuously object to the conclusion that Shishov tampered with the $CO_2$ analyzer.[8]  Indeed, other than offering the defense of inherent vice, which the Court rejects for the reasons stated in Section III-B-2, *supra*, Defendants' defense amounts to nothing more than criticisms of Plaintiff's failure to identify the precise cause of damage. *See, e.g.*, Defs' Post-Trial Brief, at 56 ("Defendants respectfully submit that if the Plaintiff's own expert cannot state with any certainty what the cause of the ripening is, then Plaintiff's case must fail.") (ECF No. 66).  Such criticism stands COGSA's burden-shifting paradigm on its head, however.  As Plaintiff has presented a *prima facie* case, *the burden is on Defendants* to demonstrate that the damage was not caused by their negligence.  "The question of precisely how, where and when the damage occurred is irrelevant in the absence of some credible evidence that the damage was caused by something other than

---

[8]      While Defendants have offered a significant amount of evidence on the issue of the $CO_2$ analyzer, the Court finds it insufficient to discharge their burden under COGSA.  Among other things, none of the proffered expert testimony negates the possibility that the $CO_2$ analyzer had been adjusted by Shishov shortly before Voyage 4 and was then re-adjusted by him in the interim period between the end of the voyage and the time at which subsequent inspections and calibrations were conducted.  (*See, e.g.*, Visser Dep. Tr. 133:3-10.)  The Court also has some concern about the credibility of Shishov's testimony on this issue.  For example, despite the controversy generated by the substantial amount of ripening of the bananas on Voyage 4, Shishov testified he could not recall whether he had done further work on the $CO_2$ analyzer after Voyage 4, or whether anyone told him to calibrate or otherwise alter the $CO_2$ analyzer during the next voyage in early February.  (Shishov Dep. Tr. 191:17 – 194:3.)  Thus, while the Court might not be able to conclude that Shishov did in fact tamper with the analyzer in a manner that caused the damage, it certainly cannot conclude that he *did not* tamper with it, and this determination is fatal to Defendants' case.

Defendants' negligence." *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 101 (2d Cir. 1998) (quoting *Transatlantic Marine*, 961 F. Supp. 55, 59 (S.D.N.Y. 1997)); *see also id.* at 101-02 ("a defendant must offer more than blanket assertions about mysterious possible causes"). As Defendants have not established that something other than their negligence caused the damage, they are liable for all of it under COGSA. While this rule might be a harsh one and "occasionally lay at the feet of an innocent carrier a loss he could not prevent and for which he bears no blame," it "reflects an understanding of the fact that the circumstances upon which [a bailee] may rely to relieve him [self] of [his extraordinary] duty are peculiarly within his knowledge and usually unknown to the shipper." *M. Golodetz Export Corp.*, 751 F.2d at 1111 (internal citations and quotation marks omitted).

Finally, Defendants argue in the alternative that the amount of any judgment against them under COGSA should be reduced by any amount attributable to Network's actions. According to Defendants, this includes Network's negligence in providing substandard Carriage Instructions, arranging the refrigerated containers near the inlet for the fresh air system for Masthouse number 2, and exacerbating the amount of damage by untimely notifying Defendants of the issue and permitting the continued discharge of the bananas upon discovery. The Court dismisses this argument because Network is not a party to this action and because the issues it raises are outside the scope of this litigation in any event. Consistent with COGSA's burden-shifting framework, this Court, in finding for Plaintiff, need not and has not determined whether or how Defendants—let alone Network—were negligent. Rather the Court merely finds that Defendants have failed to carry their burden to prove that they were not negligent or that the loss resulted from an exempted cause under COGSA.

*4. Damages*

Because the parties have stipulated to damages in the amount of $925,000, it remains only for this Court to determine whether to award pre-judgment interest. "In this Circuit, prejudgment interest will be denied . . . only under extraordinary circumstances." *Fed. Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F. 2d 347, 352 n.4 (2d Cir. 1986). Moreover, at what rate prejudgment interest will accrue is a decision committed to the discretion of the trial court. *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 520 (2d Cir. 1993). In this case, the Court finds no extraordinary circumstances exist such that Plaintiff is entitled to prejudgment interest, and elects to use the average interest rate paid on six-month United States Treasury Bills from January 31, 2012 until the date of entry of judgment. *See, e.g.*, *McCrann v. U.S. Lines, Inc.*, 803 F.2d 771, 773-74 (2d Cir. 1986).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff has carried its burden against Defendants under COGSA. Plaintiff is directed to submit a proposed judgment reflecting the Court's decision to the Clerk of Court **on or before March 20, 2015**.

**SO ORDERED.**

**Dated:** March 16, 2015

**New York, New York**

ANDREW L. CARTER, JR.
**United States District Judge**

29